J-S11002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF I.R.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1460 WDA 2021 |

Appeal from the Decree Entered October 15, 2021
in the Court of Common Pleas of Erie County
Orphans' Court at No(s):  65A in Adoption, 2021

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF T.J.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.R.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1461 WDA 2021 |

Appeal from the Decree Entered October 15, 2021
in the Court of Common Pleas of Erie County
Orphans' Court at No(s):  65 in Adoption, 2021

BEFORE:  PANELLA, P.J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY PANELLA, P.J. :                    **FILED: MAY 17, 2022**

J.R.B. ("Father") appeals *nunc pro tunc* from the decrees entered on October 15, 2021, which involuntarily terminated his parental rights to his minor daughters, T.J.B., born in August 2017, and I.R.B., born in May 2019 (collectively, "Children"). After review, we affirm the decrees.

We begin with an overview of the facts and procedural history. After receiving a referral with concerns about drug use, domestic violence, and substandard housing, Erie County Office of Children and Youth ("OCY") opened a case in August 2020, and began providing services to Father and Children's mother, S.B. ("Mother"). On October 15, 2020, Father took T.J.B. to the emergency room, where medical staff discovered that T.J.B. had three spiral fractures to her right tibia, a dislocated heel, and suspicious foot and ankle injuries. *See* N.T., 10/13/21, at Exhibit 5. Medical staff determined that the injuries were indicative of child abuse, and police began investigating the Children's mother, S.B. ("Mother"), as the alleged perpetrator.[1]  *See id.*

Several weeks later, OCY learned that Father, who had been caring for Children, returned them to Mother's care because he had a warrant out for his arrest and did not believe Mother abused T.J.B. *See id.* On November 3, 2020, OCY obtained an emergency custody authorization to remove Children. After searching for Children, OCY located Children back with Father. When OCY attempted to remove Children pursuant to the emergency custody authorization, Father took one child from the arms of a caseworker and absconded with her. *See id.* Father's mother ultimately returned the child to OCY, and OCY placed Children in foster care. *See id.*

---

[1] Ultimately, the incident was indicated for child abuse with an unknown perpetrator under the Child Protective Services Law, 23 Pa.C.S.A. §§ 6301-6388. T.J.B. has repeatedly alleged that Mother caused her injuries. *See* N.T., 10/13/21, at Exhibit 7.

OCY then filed a petition to adjudicate Children dependent. *See id.* at Exhibit 4. Father stipulated to most of the allegations in the petition, and the juvenile court determined the agency proved the remainder. *See id.* at Exhibit 5, 6. In addition to Father's actions in returning Children to Mother and absconding during Children's removal, the court found that Father had "significant mental health issues as he admittedly defecated on [Mother's] bed on November 9, 2020[,] and threaten[ed] suicide when confronted with issues regarding [Children]." *Id.* at Exhibit 4; *see also id.* at Exhibit 5, 6. It also found Father had "significant anger management issues" based upon Father's aggressiveness and explosiveness towards OCY caseworkers. *Id.* at Exhibit 4; *see also id.* at Exhibit 5, 6. Additionally, Father was violent towards Mother in the presence of Children. *See id.* at Exhibit 4-6. Finally, Father did not have stable housing; initially refused to provide a urinalysis screen; and had a history of criminal convictions and current pending charges. *See id.* Based upon these areas of concern, on November 23, 2020, the court adjudicated Children dependent pursuant to 42 Pa.C.S.A. § 6302(1) of the Juvenile Act.

At the time of the adjudication and disposition of Children, the court permitted Father to visit with Children under supervision once per week and ordered Father to comply with specific goals. *See id.* at Exhibit 5, 6. Those goals included participating in a mental health assessment and following all recommendations; participating in urinalysis; obtaining a successful discharge from programs addressing parenting, anger management, and domestic

violence; maintaining employment; obtaining and maintaining stable housing with working utilities; attending all medical appointments for Children; and meeting with OCY's caseworker at least once a month at Father's home. ***See id.***

Father initially declined visits with Children but changed his mind and began having telephonic visits[2] in January 2021. ***See*** N.T., 10/13/21, at 7. He made some initial moderate progress, but his mental health and anger management deteriorated. On March 23, 2021, the juvenile court suspended visits due to Father's inappropriate comments to Children and Children's negative behaviors, which lasted for days following the calls. ***See id.*** Per the order of the juvenile court, visits could resume when Father engaged in mental health and parenting services and demonstrated an ability to control his emotional outbursts and an ability to understand the impact of his negative comments to Children. ***See*** N.T., 10/13/21, at Exhibit 3. However, this did not occur, and the juvenile court changed Children's permanency goal to adoption at the May 21, 2021 permanency review hearing. ***See*** Exhibit 5, 6.

On June 7, 2021, OCY filed a petition seeking to terminate Father's parental rights. OCY sought termination under 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), and (b). The orphans' court appointed Steven George, Esquire,

---

[2] The visits occurred via telephone due to Covid-19 restrictions.

to represent Children.[3]  It also appointed Steven Srnka, Esquire, to represent

Father.

---

[3] Our Supreme Court has instructed this Court to verify *sua sponte* that the orphans' court appointed counsel to represent Children pursuant to 23 Pa.C.S.A. § 2313(a), and if counsel served in a dual role, that the orphans' court determined before appointment that there was no conflict between Children's best and legal interests. **See In re Adoption of K.M.G.**, 240 A.3d 1218 (Pa. 2020). If a child is "too young to be able to express a preference as to the outcome of the proceedings," there is no conflict between a child's legal and best interests, and a child's subsection 2313(a) right to counsel is satisfied by an attorney-GAL who represents the attorney-GAL's view of the child's best interests. **See In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018). Because children possess a spectrum of capabilities and are in a variety of circumstances, our Supreme Court has recognized that ascertainment of a child's ability to express a preference is child specific. **See In re P.G.F**., 247 A.3d 955, 966 (Pa. 2021).

  In the instant case, the court appointed Attorney George, who was Children's guardian *ad litem* ("GAL") in their dependency case, as "legal counsel" in the termination matter. **See** Orders, 6/9/21, at 1. Attorney George's comments during oral argument indicate that he ultimately decided to represent Children in a dual role in the termination proceedings. **See** N.T., 10/13/21, at 59-60 (indicating Children were unable to direct his representation or provide a meaningful preference due to their young ages of two and four years old and advocating for his view that grant of the petition was in their best interest). **See** N.T., 10/13/21, at 59-60. Attorney George has not participated in this appeal.

We remind the orphans' court that pursuant to **K.M.G.**, the orphans' court "must determine whether counsel can represent the dual interests **before** appointing an individual to serve as GAL/Counsel for a child." **K.M.G.**, 240 A.3d at 1236 (emphasis added). Nevertheless, given the judge's familiarity with Children's capabilities from presiding over their dependency cases and the judge's implicit ratification of Attorney George's conflict determination, **see** N.T., 10/13/21, at 60, we will not elevate form over substance. **See In re T.S.**, 192 A.3d at 1090 n.19 (holding where children received conflict-free representation, the Court would not deem a lack of formal appointment as a deprivation of child's right to counsel); **c.f. Interest of A.J.R.O.,** 270 A.3d 563, 570–71 (Pa. Super. 2022) (vacating decree and remanding because
*(Footnote Continued Next Page)*

The orphans' court conducted a hearing on the petition on October 13, 2021. The Agency called Father and its caseworker, Daniel Grochulski, as witnesses. It also introduced various exhibits, including orders related to Children's dependency matters, without objection. At the conclusion of testimony, the orphans' court announced its decision to grant OCY's petition pursuant to subsection 2511(a)(1), (a)(2), (a)(5), and (b). On October 15, 2021, the orphans' court entered the decree involuntarily terminating the parental rights of Father.[4]

After receiving permission to file an appeal *nunc pro tunc*,[5] Father filed a notice of appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). The orphans' court issued a Pa.R.A.P. 1925(a) opinion addressing Father's claims.

Father sets forth two issues for our consideration.

1. Whether the orphans' court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), and (5)?

---

certified record did not indicate whether orphans' court made the requisite determination that six-year-old child's legal and best interests did not conflict).

[4] Mother voluntarily relinquished her parental rights at the outset of the October 13, 2021 hearing, and the court entered a decree terminating her parental rights. Mother neither appealed nor participated in Father's appeal.

[5] On November 17, 2021, Father's counsel filed an application to reinstate appellate rights *nunc pro tunc*. The orphans' court granted the application, and Father filed his notice of appeal within the deadline set by the order.

> 2. Whether the orphans' court committed an error of law and/or abused its discretion when it concluded that termination of parental rights was supported by clear and convincing evidence pursuant to 23 Pa.C.S.A. § 2511(b)?

Father's Brief at 4 (unnecessary capitalization omitted).

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, we must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021) (citation omitted).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted). Instead, we may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id*. at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." ***In re Adoption of C.M.***, 255 A.3d at 358 (citation omitted). Termination of parental rights has "significant and permanent consequences for both the parent and child." ***In re Adoption of L.A.K.***, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re Adoption of C.M.***, 255 A.3d at 358 (citation and internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act. Subsection (a) sets forth eleven enumerated grounds describing parental conduct warranting involuntary termination. ***See*** 23 Pa.C.S.A. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under subsection 2511(a), the orphans' court must focus on the parent's conduct and avoid using a "balancing or best interest approach." ***Interest of L.W.***, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the orphans' court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must assess the petition

under subsection 2511(b), which focuses on the child's needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

In the instant case, the orphans' court relied upon subsections 2511(a)(2) and (b),[6] which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> * * *

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> * * *

> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

---

[6] The orphans' court also terminated Father's parental rights pursuant to subsections 2511(a)(1) and (a)(5). We need only agree with its decision as to any one subsection of subsection 2511(a) and subsection (b) in order to affirm the termination of parental rights. ***In re Adoption of K.M.G.***, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*). Father did not set forth any argument in his brief regarding subsection 2511(a)(1), thereby waiving any such challenge to the decree on this basis. ***See In re: M.Z.T.M.W.***, 163 A.3d 462, 465-66 (Pa. Super. 2017) (holding appellant waives claim where appellate brief fails to provide any discussion of a claim with citation to relevant authority). While we could affirm the entry of grounds purely based on Father's waived challenge to subsection 2511(a)(1), we instead address his argument under subsection 2511(a)(2) and affirm for the reasons we set forth in our analysis. Based on our affirmance pursuant to subsection 2511(a)(2), we do not address his argument concerning subsection 2511(a)(5).

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In his first issue, Father argues OCY failed to present clear and convincing evidence that he could not remedy or refused to remedy the issues that caused Children to be without parental care and control. *See* Father's Brief at 12. In Father's view, "he was attempting compliance with his court-ordered treatment plan[,] and he was attempting to alleviate the concerns that brought [Children] into care." *Id.* Father points to his completion of parenting classes, attendance at Corry Counseling, employment at various times, and acquisition of housing at one point. *See id.* He acknowledges that his progress "experienced setbacks" when he lost his residence due to a condemnation that was beyond his control and when he became incarcerated, but he insists he remains committed to wanting to reunify with Children. *Id.*

To prove the existence of grounds pursuant to subsection 2511(a)(2) by clear and convincing evidence,

the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

- 10 -

*Interest of D.R.-W.*, 227 A.3d 905, 912-13 (Pa. Super. 2020) (citation omitted).

Subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination under subsection 2511(a)(2) include more than affirmative misconduct and acts of refusal; it also includes parental incapacity. *Id*. Thus, sincere efforts to perform parental duties may be insufficient to remedy an incapacity. *In re Z.P.*, 994 A.2d at 1117.

Here, the orphans' court acknowledged that Father did make some attempts at regaining custody of Children and stabilizing his life. He obtained appropriate housing, became employed, and completed parenting classes. Trial Court Opinion, 2/4/22, at 13. However, Father did not maintain this initial progress: he quit his job, lost his housing, and became incarcerated. *Id.* The court found what really caused Father's downfall was his failure to engage in mental health and anger management treatment. *See id.* at 12-13. Father struggled with regulating his emotions, which then had a domino effect on all

other aspects of his life, including cooperating with OCY, engaging in services, and parenting Children. *See id.* at 5-6.

There is ample support in the record for the trial court's assessment. At the hearing, Father acknowledged he was supposed to submit to urine screens,[7] but he stated it was hard because he lost his license and gave his car away. *See* N.T., 10/13/21, at 21-22. Father did not think he needed help with drugs and alcohol, although he then backtracked and conceded he needs help with alcohol "sometimes" and he wants to drink when he gets "upset." *See id.* To that end, Father acknowledged he was supposed to go to a counseling center to address his interrelated problems of mental health, domestic violence, and anger management. *See id. at* 21-23. He started to see a counselor who could address all three areas, but Father "quit going." *Id.* at 21. In Father's words, "I was told I wasn't doing what I was doing so I figured why go when I'm being told I'm not doing anything[.]" *Id.* at 21; *see also id.* at 24.

It is unfortunate that Father did not pursue such treatment, as his mental health and significant anger clearly impeded his ability to reunify with Children. From the beginning of Children's dependency, Father was hostile towards OCY. While there is no doubt that removal of one's children is an upsetting event, Father's reactions have been extreme and interfered with

---

[7] Father had many no-shows for urine screens and several positive screens for marijuana. *See* N.T., 10/13/21, at Exhibit 10.

OCY's efforts to engage with him. *See* N.T., 10/13/21, at 57; *see also id.* at Exhibit 7. For example, following the court's adjudication and disposition of Children, caseworker Grochulski delivered the court-ordered treatment plan to Father at his home. Father swore at Grochulski, "clenched his fist," and told him "to get the fuck out of there." N.T., 10/13/21, at 43.

In December 2020, Grochulski called Father to tell him Children were in respite care, and Father responded with threats, stating, "I'm gonna fuck you up. [Grochulski], I'm gonna fuck you up for taking my girls. I'm gonna tell the judge I'm gonna fuck you up. You're the third one on my list I'm gonna fuck up." *Id.* at Exhibit 7; *see also id.* at 45. Father followed up with a text message with further threats. *See id.* at Exhibit 7. He also threatened other caseworkers and Grochulski's supervisor, and in April 2021, he twice posted threats on social media. *See id.*

Father's threatening behavior has resulted in OCY's reporting Father's threats to police three times. *See id.* Despite Grochulski's concerns for his own personal safety, he continued to attempt to engage Father. *See id.* at 47. However, Father's mental health continued to deteriorate. *See id.* at 44-46, 57. For example, Father purchased new bedroom furniture for Children, but on April 20, 2021, he texted Grochulski that he was going to burn the beds in his backyard. *See id.* at Exhibit 7; *see also id.* at 27-28.

Father's erratic behavior spilled over to his interactions with Children. For example, he told Children during a visit that he got a new apartment and

bedroom suites for them, but during a visit a week later, he told them he was going to let their foster parents keep them and he would say a final goodbye to them. *Id.* at Exhibit 7. It also apparently affected his interactions with others, including his non-dependent son. The mother of that child filed a petition pursuant to the Protection from Abuse ("PFA") Act, 23 Pa.C.S.A. §§ 6101-6122. In October 2021, following a PFA hearing, an Erie County judge entered a three-year PFA order against Father protecting his son and his son's mother. *See* N.T., 10/13/21, at 17-19.

On June 10, 2021, about three weeks after the juvenile court changed Children's permanency goal to adoption, Father was arrested and jailed on various charges. *See id.* at Exhibit 8; *see also id.* at 14-17. He was released on bond in early August 2021, and "[t]hirty-something hours" later, he was jailed on another set of charges. *Id.* at 16. At the time of the hearing to terminate his parental rights, Father remained incarcerated at Erie County Jail with both sets of charges still pending.[8] By his own admission, Father has not addressed his anger because he is "always in the hole or . . . in max," where the prison will not allow him to engage in programs. *Id.* at 30. At the time of the hearing, he was out of solitary confinement, but was "locked down 23 out

_____

[8] The first set of charges included the misdemeanor crime of terroristic threats. The second set of charges included the felony crimes of criminal trespass and intimidation of a witness, and the misdemeanor crime of terroristic threats. *See id.* at Exhibit 8. The alleged victims on the second set of charges was the mother of Father's son and a person Father contends is Mother's ex-finance. *See id.* at 16-17.

of 24 hours" in the "max." ***Id.*** at 37. Nevertheless, when his attorney asked him if he would investigate participating in services when he gets out of maximum security, Father responded, "Not in the jail, no." ***Id.*** at 37.

Father's testimony solidified the depths of his problems and demonstrated his lack of progress. Father admitted that during Children's dependency hearings, he "wasn't really listening." N.T., 10/13/21, at 24. As he testified, "All I was thinking about was my girls like being gone. I wasn't paying attention to anything you guys had to say." ***Id.*** He continued, "And then whenever I would get letters, I would just rip it up and throw it in the toilet." ***Id.***; ***see also id.*** at 23 (repeating that when he got something from OCY, he "would just rip it up or burn it") ***Id.*** at 25. Father admitted he knew OCY wanted him to follow the court order, but he "didn't think that was important." ***Id.*** at 28.

Prior to going to jail, in lieu of complying with the court-ordered treatment to address his anger, Father instead "just stayed home and walked [his] dog," and "smoked weed to keep [him] calm." ***Id.*** at 31. This strategy was not successful. When OCY's attorney asked Father what he had done since OCY removed Children almost a year prior, Father responded,

> Everything what I thought you were supposed to do to take care of your kids, not by going and taking a drug test because you're being told you're doing this, I went and got a two-bedroom apartment. I went and got them their beds. I did everything. We painted their whole freak – the whole apartment, you know what I mean. Took out – everything that was in the food pantry, I took it out and turned it into like a little doll house and then all of a sudden, I looked in the ceiling part of the kitchen and I saw black

- 15 -

and then I seen like that falling through that was all mold between up in the ceiling and landlord would not fix it, would not fix it. So I'm like, all right, I'm done paying rent until you fix it. And then that started bothering me and then I got shot out, I just lost my mind.

*Id.* at 26. By "shot out," Father explained that he "was just getting angry and I don't know, I couldn't control my body, how I felt." *Id.* at 27. Father estimated this was in the spring of 2021. *Id.* He also admitted that it even impacted his ability to work, stating that he "just had a hard time working" and had to quit a job because Mother's sister worked there and "all [he] could see was [his] kids or [Mother]." *Id.* at 35.

Father acknowledged he was not able to parent Children while he was in jail. By his assessment, he needed one to two months after he was eventually released to work and save up money for an apartment before he was ready to parent. *See id.* at 32. Father admitted he had mental health issues and needed anger management. *See id.* at 32 ("I do lose it, yeah."); *see also id.* at 34. But Father denied that his anger had an impact on his ability to parent Children, particularly now that Mother relinquished her parental rights to Children, and he knew T.J.B. would no longer get abused. *See id.* at 33-34. He seemed to think his anger problem would disappear, stating, "I don't think I should have to complete anger management and all that stuff just for my girls. I was doing good until all this start happening." *Id.* at 34. Despite his earlier admission that he knew he needed to undergo treatment for his anger, later in the hearing Father insisted all he should have

to do to regain custody was to "[w]ork and get stuff for [his] kids," because "that's what a parent does, you buy stuff for your kids, you take care of them." *Id.* at 36.

All of this evidence is sufficient to support the orphans' court's conclusion that Father has been and will be unable to parent Children due to his interrelated issues of mental health, inability to control his anger, and propensity to engage in intimate partner violence. OCY proved Father was unable to control his emotional and behavioral state. This incapacity along with his refusal to obtain treatment means the orphans' court was well within its discretion to conclude OCY established grounds to terminate Father's parental rights under subsection 2511(a)(2).

In his second issue, Father contends there was insufficient evidence proving that termination of his parental rights served the needs and welfare of Children. *See* Father's Brief at 14-15. His argument is brief; he argues Children have high levels of needs and his consistent participation in Children's medical appointments when he was able, combined with his act of bringing T.J.B. to the emergency room at the outset of the case, demonstrated his willingness and ability to meet Children's needs. *See id.*

As noted previously, subsection 2511(b) requires the orphans' court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles

such as love, comfort, security, and stability." ***T.S.M.***, 71 A.3d at 267 (citation and internal quotation marks omitted). Our Supreme Court has made clear that subsection 2511(b) requires the orphans' court to consider the nature and status of bond between a parent and child. ***In re E.M.***, 620 A.2d 481, 484-85 (Pa. 1993). Parental rights may be terminated notwithstanding the existence of a parent-child bond. ***Id***. Courts must examine the effect upon a child of severing the bond, particularly whether termination of parental rights will destroy a "necessary and beneficial" relationship and cause a child to suffer "extreme emotional consequences." ***Id.***

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." ***In re M.M.***, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." ***Id***. (brackets omitted). In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." ***Interest of L.W.***, 267 A.3d at 524 (citation omitted).

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268 (citation omitted). The Court directed that, in weighing the bond considerations pursuant to subsection 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

The orphans' court found Children's needs were best served by terminating Father's parental rights and pursuing adoption with their foster parents. As the orphans' court reasoned, Children "have difficulty forming an attachment to anyone, let alone [Father], who was unable to care for them when they were in his custody." Trial Court Opinion, 1/4/22, at 13-14. Terminating Father's parental rights will enable Children to obtain permanency with their foster parents, who have demonstrated an ability to meet Children's needs. *See id.*

The record supports the trial court's findings and conclusions. Both Children suffered from significant behavioral issues and were diagnosed with reactive attachment disorder. *See* N.T., 10/13/21, at 51; *see also id.* at

Exhibit 11. As the caseworker explained, this meant neither child had a secure and healthy emotional bond with a primary caregiver. *Id.* at 51.

They both also exhibited aggressive behavior. I.R.B., who was two years old, was working with early intervention and family-based mental health services in her foster home and at daycare. *Id.* at 49-50, 52. The caseworker testified it is unusual for a child that young to be involved with mental health services, but her behavior has been "out of control" and beyond typical difficult toddler behavior. *See id.* at 49-50. She is defiant at daycare and exhibited aggressive behaviors, such as hitting, throwing toys at other children, spitting, kicking, and biting. *See id.* at 49.

Like her sister, four-year-old T.R.B. has had various mental health services working with her in her foster home and at daycare. *Id.* at 52. At daycare, T.R.B. was hitting, spitting, and using profanity towards staff. *Id.* One time she mimicked stabbing a teacher; on other occasions, her classmates had to leave the room due to her behavior. *Id.* at 52. She requires "constant redirection" and has exhibited tantrums lasting for an hour. *Id.* at 53. Fortunately, her tantrums have decreased, and she has shown some improvement. *Id.*

Although Children's behaviors are challenging, their foster parents have engaged with services and are committed to meeting their needs. *See id.* at 50, 53. Children are placed in the same pre-adoptive foster home. *Id.* Despite Children's difficulties in attaching to caregivers, they look to their foster

parents to meet their needs and for comfort, and their foster parents respond with love and affection. *See id.* at 54. In caseworker Grochulski's opinion, terminating Father's rights will not be detrimental to Children and in fact will benefit them insomuch as they can obtain security with their foster parents. *Id.* at 55.

We discern no abuse of discretion in the conclusion of the orphans' court that termination served Children's needs and welfare. Both Children were young when OCY removed them from Father's care.

T.R.B. experienced significant trauma and physical abuse. Although Father did bring her to the hospital and may have attended some medical appointments,[9] he subsequently took no steps to protect T.R.B. from Mother, and did not address his own issues so he could reunify with Children and help T.R.B. process her trauma. Instead, his erratic comments to Children and his unstable behavior led to suspension of his visits.

At the time of the hearing in October 2021, he had not had contact with Children in six months. Meanwhile, Children began to experience security and stability with their foster parents, who have responded to the effects of Children's trauma with love and support. Given the evidence establishing the lack of a secure bond with Father and Children's need to for stability and

___

[9] Father asserts this twice in his brief but provides no citation to the record in support.

security, the trial court was well within its discretion to conclude that termination served Children's needs and welfare. ***See Interest of L.W.***, 267 A.3d at 524.

Having found that the orphans' court did not err or abuse its discretion in terminating Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b), we affirm the decrees.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/17/2022